Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| SANDRA E. ROSA RODRÍGUEZ<br><br>Recurrida<br><br>V.<br><br>HOSPITAL PAVÍA ARECIBO<br><br>Peticionario | KLCE202301320 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Arecibo<br><br>Caso Núm.: AR2021CV00593<br><br>Sobre: DESPIDO INJUSTIFICADO (LEY NÚM. 80) Y OTROS |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Pérez Ocasio y la Jueza Martínez Cordero.[1]

Grana Martínez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 22 de febrero de 2024.

Doctor Susoni Health Community Service Corp. solicita que revisemos la resolución en la que el Tribunal de Primera Instancia se negó a desestimar sumariamente la demanda.

La recurrida, Sandra Rosa Rodríguez, presentó su oposición al recurso.

**I**

El 11 de febrero de 2014, la recurrida comenzó a trabajar para el peticionario en el Departamento de Manejo de Información como asistente administrativo. Su supervisora era la señora Marelyz Padilla. El 15 de diciembre de 2014 fue trasladada al Departamento de Sala de Operaciones. No obstante, el 12 de octubre de 2018, la peticionaria presentó una querella por hostigamiento sexual contra su supervisor en ese departamento. La investigación realizada evidenció que la relación fue consentida. La recurrida fue severamente advertida y trasladada al Departamento de Vacunación. Durante el mes de julio de 2019 se recibió una queja en su contra por unos comentarios en

---

[1] Debido a la inhibición de la Jueza Domínguez Irizarry, la Jueza Martínez Cordero se designa en sustitución y se constituye panel especial mediante Orden Adm. OATA-2023-205 de 30 de noviembre de 2023.

su red social de Facebook en los que escribió sobre una visitante, un paciente y otra empleada del hospital.

El 20 de julio de 2019 fue despedida de su empleo, como resultado de esa queja y de la investigación realizada.

El 6 de mayo de 2021, la recurrida presentó una querella contra el peticionario en la que alegó que fue objeto de despido injustificado, discrimen, hostigamiento sexual y represalia. La querella se presentó al amparo del procedimiento sumario laboral. La recurrida alegó que:

(1) Laboró ininterrumpidamente como empleada a tiempo indeterminado en el puesto de Asistente Administrativo desde el 11 de febrero de 2014 hasta el 23 de julio de 2019.

(2) Previo su despido presentó varias quejas internas.

(3) Presentó la última queja el 23 de julio de 2019 relativa al pago de un cheque quincenal atrasado, falta de renovación de plan médico y registro inadecuado de asistencia.

(4) **Participó en el proceso de organización de una unión obrera** y fue testigo en un proceso legal en contra del peticionario.

(5) Presentó una queja interna por hostigamiento sexual contra su Supervisor Orlando Vélez y la querellada no tomó las medidas remediativas necesarias e inmediatas para erradicar esta situación.

(6) El despido fue injustificado y un acto de represalia en violación a la Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, y la Ley Núm. 4 de 26 de enero de 2017 sobre despido injustificado.

(7) Los hechos anteriormente expuestos le han ocasionado daños y perjuicios de intensidad a la querellante.

(8) Previo a la radicación de la presente reclamación se realizaron varias gestiones extrajudiciales dirigidas a resolver los reclamos de la querellante, los cuales han sido infructuosos.

La recurrida reclama en la Primera Causa de Acción presentada al amparo de la Ley Núm. 115 del 20 de diciembre de 1991, una indemnización de $120,000.00 por daños y angustias mentales, así como los salarios y beneficios marginales dejados de devengar. La Segunda Causa de Acción está basada en un alegado patrón de

hostigamiento sexual por parte de su Supervisor, Orlando Vélez, y de la señora Edel López en violación de la Ley Núm. 17 del 22 de abril de 1998, según enmendada, 29 LPRA sec. 155 et seq. La Tercera Causa de Acción está basada en la Ley Núm. 100 contra el discrimen en el empleo. La Cuarta Causa de Acción es por violación a la Ley de Despido Injustificado, Ley Núm. 80 de 30 de mayo de 1976 y reclama una mesada de $8,023.00.

El peticionario alegó que el despido fue justificado. El hospital adujo que despidió a la recurrida porque publicó en las redes sociales unos comentarios que lesionaron la imagen y las relaciones entre los compañeros de trabajo. Según el peticionario, la recurrida hizo comentarios inadecuados, impropios y despectivos en sus redes sociales sobre la hija **de un paciente recluido en el área de intensivo** y familiar de otra empleada. Además, de que: (1) se negó a cooperar en el proceso investigativo, (2) violentó la política sobre el uso del teléfono celular, porque hizo unas treinta publicaciones en el Facebook durante su horario de trabajo, (3) previamente había sido disciplinada y orientada por otras faltas cometidas, (4) presentó una querella por hostigamiento sexual contra su supervisor con información falsa, porque la investigación evidenció que la relación amorosa con su supervisor fue consentida y que ambos incurrieron en actos de naturaleza sexual en horas de trabajo y fuera del horario laboral.

Doctor Susoni Health Community Service Corp., además, argumentó que: (1) atendió la querella de hostigamiento sexual conforme a la ley, (2) la recurrida fue orientada de que sería despedida de incurrir nuevamente en conducta sexual no deseada, 3) la recurrida presentó otras querellas que también fueron atendidas, (4) las partes llegaron a un contrato de transacción que impide que la recurrida presente esta demanda., (4) el caso es de jurisdicción exclusiva de la Junta de Relaciones del Trabajo, porque la recurrida

alega que el despido obedeció a su participación en la Junta Nacional de Relaciones del Trabajo

El peticionario pidió al TPI que dictara sentencia a su favor. La recurrida presentó oposición a la que el peticionario replicó.

El foro a *quo* denegó la sentencia sumaria presentada por el Hospital Pavía. Según se desprende de la Resolución emitida por el Tribunal de Primera Instancia,[2] surge de los **hechos incontrovertidos aceptados por las partes, según propuestos por la parte querellada** lo siguiente:

1. La señora Rosa Rodríguez comenzó a trabajar en Hospital Pavía el 11 de febrero de 2014 como Asistente Administrativa en el Departamento de Manejo de Información bajo la supervisión de la señora Maritza Marrero y Marelyz Padilla.

2. Durante su empleo con el Hospital, la Sra. Sandra Rosa Rodríguez recibió copia de la Descripción de sus Deberes.

3. Durante su empleo con el Hospital, la Sra. Sandra Rosa Rodríguez recibió copia del Manual del Asociado.

4. Durante el transcurso de toda su relación de empleo con el Hospital, la Sra. Sandra Rosa Rodríguez conocía que tenía que cumplir con las directrices impartidas por su supervisor(a), con sus funciones, con su horario, que tenía que dedicar su tiempo de trabajo para las tareas que tuviera asignada, y tenía que cumplir con las normas del Hospital.

5. Durante su empleo con el Hospital, la Sra. Sandra Rosa Rodríguez también conocía que tenía que cumplir con las normas de la institución, incluyendo las normas de trato cordial y respeto a los empleados, normas de respeto y confidencialidad.

6. Durante su empleo con el Hospital, la Sra. Sandra Rosa Rodríguez suscribió una Declaración y Acuerdo para Confidencialidad y No Divulgación de Información.

7. (sic.) 13. Efectivo el 15 de diciembre de 2014, la Sra. Sandra Rosa Rodríguez fue transferida a la posición de Asistente Administrativo en el Departamento de Sala de Operaciones, bajo la supervisión del señor Orlando Vélez y la señora Elizabeth Pérez.

8. (sic).14. El 19 de agosto de 2015, la Sra. Sandra Rosa Rodríguez solicitó una reunión en el Hospital para orientación por problemas matrimoniales. Según

---

[2] Véase SUMAC, entrada núm. 76.

comunicó, su entonces esposo le reclamó por excesiva confianza que mantenía con su supervisor, el Sr. Orlando Vélez. Durante la reunión sostenida, a la Querellante se le orientó sobre la posibilidad de solicitar una orden de protección contra su esposo, pero ella indicó que no estaba interesada. Además, se le ofreció el Programa de Ayuda al Empleado, pero rehusó el mismo. Finalmente, se le ofreció activar el Protocolo de Violencia Doméstica, y la Querellante indicó que no era necesario.

9. (Sic.) 15. Además de lo anterior, en el año 2015 la Sra. Sandra Rosa Rodríguez solicitó ajustes de horarios por razones personales y del cuido de sus hijas, los cuales le fueron concedidos.

10. (Sic)18. El 10 de junio de 2016, la Sra. Sandra Rosa Rodríguez nuevamente recibió una orientación sobre el Protocolo de Violencia Doméstica. Esta vez, la Querellante completó el formulario debido a una situación con su esposo suscitada en la residencia de ellos.

11. (Sic)19. El 23 de marzo de 2017, la Sra. Sandra Rosa Rodríguez cursó carta a su supervisor, el Sr. Orlando Vélez, para informar siete (7) fechas entre los meses de marzo y abril en las que necesitaría nuevos ajustes de horario para atender sus situaciones personales.

12. (Sic) 20. El 30 de marzo de 2017, la Sra. Sandra Rosa Rodríguez solicitó la aprobación de una licencia médico/familiar, efectiva desde el 31 de marzo de 2017 al 23 de junio de 2017, para una situación de salud de su hija. Esta petición fue concedida.

13. (Sic) 26. El 12 de octubre de 2018, la Sra. Sandra Rosa Rodríguez presentó una queja verbal al Sr. Rafael Mass, supervisor de anestesia, sobre una situación que ella interpretaba como hostigamiento sexual de parte de su supervisor Orlando Vélez.

14. (Sic) 27. El señor Mass documentó la entrevista y refirió el asunto por escrito el mismo día al Departamento de Enfermería y al Departamento de Recursos Humanos para las acciones correspondientes.

15. (Sic) 28. El 12 de octubre de 2018, el Hospital entrevistó a la Sra. Sandra Rosa Rodríguez y tomó las siguientes acciones: a) le orientó sobre que procedería con la investigación siguiendo el proceso establecido por el Hospital; b) le orientó sobre la confidencialidad del proceso; c) le informó que al concluir la investigación se le informaría las medidas correspondientes; d) se le exhortó a evitar comunicación con el señor Vélez y que informara inmediatamente cualquier otra situación; e) se le informó que por el momento se estarían tomando medidas preventivas; y f) se le instruyó a presentarse a la oficina de Recursos Humanos para instrucciones y no reportarse a la Sala de Operaciones.

16. (Sic) 29. Durante el proceso de investigación sobre la queja que(sic) la Sra. Sandra Rosa Rodríguez, el Hospital recibió varias comunicaciones de su parte.

17. (Sic) 31. Como medida preventiva, el Sr. Orlando Vélez fue separado temporeramente del empleo mientras culminaba la investigación, y se le instruyó a no comunicarse con la Querellante.

18. (Sic) 34. El 18 de octubre de 2018, mientras se conducía la investigación de la queja, el Hospital se reunió con la Querellante en seguimiento a cómo se encontraba y para conocer si el señor Vélez había intentado comunicarse con ella. La Sra. Sandra Rosa Rodríguez contestó que se sentía bien y refirió que el señor Vélez no se había comunicado con ella. Se le informó que se continuaba con el proceso de investigación y que una vez se concluyera, se le informaría el resultado de la investigación.

19. (Sic) 36. La Querellante entregó al Hospital copia de los mensajes de texto que intercambió con el supervisor el domingo 16 de septiembre de 2018, luego de los sucesos, donde coordinaron encontrarse en su tiempo libre fuera del trabajo.

20. (Sic) 46. El 1 de noviembre de 2018, la Sra. Sandra Rosa Rodríguez fue nombrada Asistente Administrativa del Departamento de Vacunación, bajo la supervisión de la Lcda. Yormaris Medina. Este fue el último departamento donde laboró la Sra. Sandra Rosa Rodríguez previo a su terminación.

21. (Sic) 49. El 17 de julio de 2019, el Hospital recibió una queja en contra de la Sra. Sandra Rosa Rodríguez por unas expresiones escritas en la red social Facebook. La queja refería, entre otros datos, que tras la visita de la Sra. Sonia Barreto en el Hospital, la Sra. Sandra Rosa Rodríguez documentó información sobre ella en su Facebook.

22. (Sic) 66. El 22 de julio de 2019, luego de la entrevista de la Sra. Sandra Rosa Rodríguez, la Sra. Janira Hernández y el Lcdo. Luis Berdiel, se reunieron para discutir el resultado de la investigación y determinaron proceder con el despido de la Querellante.

23. (Sic) 70. El despido de la Sra. Rosa Rodríguez le fue comunicado el 23 de julio de 2019.

De la misma manera, el TPI expone en la Resolución, los **hechos adjudicados por el Tribunal no rebatidos por la querellante**:

1. (Sic)11. El 18 de noviembre de 2014, la Sra. Sandra Rosa Rodríguez recibió una amonestación escrita por infringir las normas #23 y #24 del Reglamento Disciplinario.

2. (Sic)16. El 16 de septiembre de 2015, la Sra. Sandra Rosa Rodríguez recibió una amonestación escrita por infringir las normas #20 y #24 del Reglamento Disciplinario.

3. (Sic) 21. El 8 de noviembre de 2017, la Sra. Sandra Rosa Rodríguez presentó su carta de renuncia al Hospital con fecha de efectividad del 27 de noviembre de 2017. La renuncia estaba motivada a razones de mudanza fuera de Puerto Rico, en busca de una mejor calidad de vida para la Querellante y sus hijas. En su carta de renuncia, la Querellante indicó que tenía "sentimientos encontrados" y que había sido "una experiencia gratificante de mucha enseñanza para [ella], el haber trabajado en el Hospital". Además, agradeció "de manera especial a [su] Supervisor, Orlando Vélez, por enseñar[l]e todo lo que [logró] aprender sobre el área clínica" entre otras cosas.

4. (Sic) 22. El 22 de noviembre de 2017, la Sra. Sandra Rosa Rodríguez cursó comunicación al Hospital para retirar su carta de renuncia y solicitó disculpas por "cualquier situación que s[é] debe haber ocurrido." En la carta indicó que se sentía "muy responsable por brindarle apoyo a [sus] compañeras de trabajo de Sala de Operaciones y [que sentía] que si [se iba] los defraudo.

5. (sic) 23. El 4 de enero de 2018, el Hospital recibió una queja en contra de la Sra. Sandra Rosa Rodríguez por comportamiento irrespetuoso y descortés hacia su compañera de trabajo, Edel López.

6. (Sic) 24. El 22 de mayo de 2018, el Hospital recibió una nueva queja en contra de la Sra. Sandra Rosa Rodríguez por comportamiento irrespetuoso y descortés hacia su Coordinadora Clínica. A la Querellante se le brindó la oportunidad de presentar por escrito una respuesta, la cual presentó el 23 de mayo.

7. (Sic) 25. El 6 de junio de 2018, culminada la investigación sobre la queja presentada el 22 de mayo de 2018 en contra de la Sra. Sandra Rosa Rodríguez, el Hospital concluyó que ésta había incurrido en la infracción #23 del Manual de Procedimientos Disciplinarios, referente a comportarse en forma desatenta, irrespetuosa o descortés al tratar compañeros o supervisor y, en consecuencia, le fue aplicada una suspensión de cinco (5) días laborables. En esa ocasión, se le advirtió a Rosa Rodríguez que "de continuar con esta práctica, se tomarían medidas disciplinarias más severas que pudieran conllevar hasta el despido."

Según el TPI, "[e]l presente caso se fundamenta en alegadas acciones tomadas por el patrono contra la querellante por ésta participar en actividades protegidas. Indica la querellante que

participó ... "*en un proceso de organización de una Unión Obrera y fue testigo en un proceso legal en contra de la parte querellada. Anteriormente esta presentó una queja interna sobre actos de hostigamiento sexual recibidos de parte de su Supervisor Orlando Vélez*". Debido a lo antes mencionado el patrono tomó represalias en su contra.

El foro primario determinó que, el patrono presenta una serie de incidentes que alega fueron conductas de la querellante en contra de los reglamentos disciplinarios. Sin embargo, no existe controversias que el Sr. Orlando Vélez y la demandante se vieron envueltos en cierta conducta sexual dentro del empleo.[3] Ello provocó una querella por parte de la querellante. De la propia investigación del patrono se desprende que el elemento principal para la adjudicación por parte del Hospital lo fue la credibilidad de la querellante. Ese elemento probatorio escapa de la consideración de una sentencia sumaria.

Además, determinó que coetáneo con esa querella, fue que se presentaron las querellas que sirvieron de base para el despido de la querellante. La proximidad de esos eventos nos obliga a considerar la veracidad de los eventos alegados y determinar si la querellante incurrió en los mismos, con independencia de las alegaciones de hostigamiento sexual. Ello no puede ser objeto de disposición mediante una sentencia sumaria.

Finalmente, resolvió que tampoco la moción de sentencia sumaria atiende las alegaciones de la querellante en cuanto a su participación en otras actividades protegidas como la organización de una Unión Obrera y su alegada participación como testigo en un proceso legal en contra de la parte querellada.

---

[3] Nota al pie de página original de la Resolución emitida por el TPI: "No queda claro si fuera del escenario de trabajo también se vieron envueltos en la misma conducta".

A base de lo antes discutido, el tribunal entiende que debe adjudicar los siguientes hechos en controversia."[4]

Acto seguido, el foro primario elaboró en su fase dispositiva **los hechos sobre los cuales existen controversias**:

1. ¿Incurrió el Sr. Orlando Vélez en conducta sexual no consentida hacia al demandante, Sandra E. Rosa Rodríguez?

2. ¿Las acciones tomadas por el patrono sobre los alegados hechos en los que incurrió la demandante y que sirvieron como justificación de su despido se tomaron en represalia por las quejas presentadas por la demandante contra el Sr. Orlando Vélez?

3. ¿Cuál era el procedimiento vigente que tenía el demandado para procesar las denuncias sobre Hostigamiento Sexual en el Empleo?

4. ¿Incurrió la demandante en la conducta imputada sobre el uso de el (sic) equipo del Hospital, para trabajos universitarios de ella?

5. ¿Incurrió la demandante en la conducta imputada sobre las publicaciones en la red social de Facebook?

Inconforme, la parte peticionaria presentó este recurso en el que hace los señalamientos de errores siguientes:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE A DESESTIMAR LA RECLAMACIÓN DE DISCRIMEN POR SUPUESTAS ACCIONES CONCERTADAS, RECLAMACIÓN QUE RECAE BAJO LA JURISDICCIÓN EXCLUSIVA DE LA JUNTA NACIONAL DE RELACIONES DEL TRABAJO.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE A DESESTIMAR LAS ALEGACIONES DE HOSTIGAMIENTO SEXUAL PRESENTADAS POR LA RECURRIDA AL AMPARO DE LA LEY NÚMERO 17-1988, BAJO EL SUPUESTO DE QUE LA INVESTIGACIÓN DEL PATRONO SE BASÓ EN EL ELEMENTO DE CREDIBILIDAD, NEGÁNDOSE A DAR DEFERENCIA Y SUSTITUYENDO SU CRITERIO, SITUÁNDOSE ASÍ EN LA POSICIÓN DE SÚPER DEPARTAMENTO DE PERSONAL.

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NEGARSE A DESESTIMAR LA TOTALIDAD DEL CASO, LUEGO DE QUEDAR INCONTROVERTIDA LA FALTA COMETIDA POR LA RECURRIDA, ASÍ COMO LOS HECHOS QUE JUSTIFICARON SU DESPIDO A TENOR CON LA LEY NÚM. 80-1975 Y LE EXIMEN DE RESPONSABILIDAD BAJO CUALQUIER OTRO ESTATUTO.

---

[4] Véase SUMAC, entrada núm. 76.

## II

### Certiorari

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar a su discreción una decisión de un tribunal inferior. *Rivera Gómez y otros v. Arcos de Dorados Puerto Rico, Inc. y otros*, 2023 TSPR 65, 212 DPR ___ (2023); *Caribbean Orthopedics Products of Puerto Rico, LLC v. Medshape, Inc.*, 207 DPR 994, 1004 (2021); *800 Ponce de León Corp. v. American International Insurance Company of Puerto Rico*, 205 DPR 163, 174 (2020); *Mun. de Caguas v. JRO Construction*, 201 DPR 703, 710 (2019). Aunque la característica principal del recurso reside en el carácter discrecional del mismo, tal determinación no es irrestricta, está sujeta a los criterios señalados en la Regla 52.1 de Procedimiento Civil. Advertimos que esta Regla ha sufrido modificaciones a través del tiempo para expandir el marco discrecional que ostentan los foros revisores en la expedición del recurso.

En la actualidad, la Regla 52.1 de Procedimiento Civil específicamente dispone que el recurso de *certiorari* solamente será expedido:

> [p]ara revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo.
>
> No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia.
>
> Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión. Cualquier otra resolución u orden interlocutoria expedida por el Tribunal de Primera Instancia podrá ser revisada en el recurso de apelación que se interponga contra la sentencia sujeto a lo

dispuesto en la Regla 50 sobre los errores no perjudiciales.

32 LPRA Ap. V, R. 52.1.

Superado el análisis al amparo de la Regla 52.1 de Procedimiento Civil, *supra,* el foro apelativo deberá auscultar los criterios de la Regla 40 del Reglamento del Tribunal de Apelaciones para guiar su discreción al intervenir con la resolución u orden interlocutoria recurrida. La Regla 40 dispone:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> B) Si la situación de los hechos planteada es la más indicada para analizar el problema.
>
> C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto de la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, por los cuales deberán ser elevados, o de alegatos más elaborados.
>
> E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.
>
> F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.
>
> G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

4 LPRA Ap. XXII-B, R. 40.

Los tribunales apelativos no debemos intervenir en las determinaciones del foro primario a menos que se demuestre que el juzgador: (1) actuó con prejuicio o parcialidad, (2) incurrió en un craso abuso de discreción, o (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Rivera y Otros v. Bco. Popular,* 152 DPR 140, 155 (2000); *Lluch v. España Service Sta.,* 117 DPR 729, 745 (1986).

**Sentencia Sumaria**

La sentencia sumaria promueve una solución justa, rápida y económica para litigios de naturaleza civil en los que no hay controversia genuina sobre hechos materiales que componen la causa de acción. *Birriel Colón v. Econo y otros,* 2023 TSPR 120, 213 DPR ___ (2023); *Acevedo y otros v. Depto. Hacienda y otros,* 2023 TSPR 80, 212 DPR ___ (2023); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019). La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, establece que la sentencia sumaria procede cuando las alegaciones, deposiciones y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia, acreditan que no existe una controversia real y sustancial respecto a algún hecho esencial y material. *Íd.*, pág. 291.

El tribunal podrá dictar sentencia sumaria a favor del promovente, sin necesidad de celebrar un juicio, si no existe controversia de los hechos materiales que motivaron el pleito y únicamente resta aplicar el derecho a los no controvertidos. *González Meléndez v. Mun. San Juan et al.,* 2023 TSPR 95, 212 DPR ___ (2023)*; Acevedo y otros v. Depto. Hacienda y otros,* supra; *Roldán Flores v. M. Cuebas et al*, 199 DPR 664, 676 (2018). La sentencia sumaria únicamente procede cuando el derecho aplicable lo justifica. La Regla 36.3 de Procedimiento Civil, *supra*, dispone los requisitos con los que debe cumplir una moción de sentencia sumaria. *Oriental Bank v. Perapi et al*, 192 DPR 7, 25 (2014).

La parte promovente de la moción de sentencia sumaria tiene que desglosar los hechos sobre los que alega no existe controversia. Además de especificar para cada uno la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya. *Roldán Flores v. M. Cuebas et al*, supra, pág. 676; *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010). Mientras que, la parte que se opone a una moción de sentencia sumaria tiene que demostrar que

existe controversia en cuanto a algún hecho material. Se considera un hecho material aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Roldán Flores v. M. Cuebas et al*, supra. Para ello, el promovido deberá presentar una contestación detallada y específica, y refutar los hechos que entiende que están en disputa con evidencia sustancial. *Birriel Colón v. Econo y otros*, supra; *Abrams Rivera v. E.L.A.*, 178 DPR 914, 933 (2010). Si, al contrario, asume una actitud pasiva y descansa únicamente en sus alegaciones, se expone a que se dicte sentencia sumaria en su contra sin la oportunidad de un juicio en su fondo, de proceder en derecho. *León Torres v. Rivera Lebrón*, 204 DPR 20, 43-44 (2020).

Cualquier duda no es suficiente para derrotar la procedencia de una moción de sentencia sumaria. La duda existente tiene que permitir concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes. Los tribunales solo podemos concluir que existe una controversia real y sustancial en cuanto a un hecho material, cuando el oponente presenta prueba que podría inducir a un juzgador racional a resolver a su favor. *Oriental Bank v. Perapi et al*, supra, pág. 26.

La sentencia sumaria tampoco procede, si existen alegaciones afirmativas en la demanda que no han sido refutadas y de los documentos que acompañan la moción de sentencia sumaria surge controversia sobre algún hecho material y esencial, o cuando como cuestión de derecho no procede el remedio sumario. *Oriental Bank v. Perapi et al*, supra, págs. 26, 27.

El tribunal apelativo utilizará los mismos criterios que el Tribunal de Primera Instancia al determinar si procede una sentencia sumaria. No obstante, al revisar la determinación del Tribunal de Primera Instancia, únicamente podrá considerar los documentos que se presentaron ante ese foro. Las partes no podrán traer en apelación evidencia que no fue presentada oportunamente ante el Tribunal de

Primera Instancia, ni esbozar teorías nuevas o esgrimir asuntos nuevos. El tribunal apelativo únicamente puede determinar si existe o no alguna controversia genuina de hechos materiales y esenciales y si el derecho se aplicó correctamente. Sin embargo, no puede adjudicar hechos materiales en disputa porque esa tarea es del foro de primera instancia. *Meléndez González et al v. M. Cuebas*, 193 DPR 100, 114, 116 (2015).

El Tribunal Supremo de Puerto Rico adoptó la norma establecida en la esfera federal de que la oposición a la sentencia sumaria no es el vehículo apropiado para presentar reclamaciones nuevas que nunca antes habían sido aducidas. Por esa razón, la parte demandante tiene vedado cualquier intento de incorporar reclamaciones nuevas o corregir deficiencias en su demanda, una vez sometida una solicitud de sentencia sumaria. El procedimiento adecuado en esas circunstancias es solicitar la anuencia del tribunal para enmendar la demanda. *León Torres v. Rivera Lebrón,* supra, págs. 45-49.

La aplicación de la sentencia sumaria no está excluida en ningún tipo de caso y puede funcionar en cualquier contexto sustantivo. El Tribunal Supremo de Puerto Rico ha resuelto que la sentencia sumaria procede sin importar lo complejo que sea el caso, siempre que la moción en apoyo este bien fundamentada y establezca que no existe controversia real en cuanto a los hechos materiales. *Meléndez González et al v. M. Cuebas,* supra, pág. 112.

### La Ley de Indemnización por Despido sin justa causa Ley Núm. 80 de 30 de mayo de 1976

La Ley Núm. 80, *supra,* protege a los empleados de las actuaciones arbitrarias del patrono, porque les provee remedios económicos que desalienten los despidos injustificados.

Su artículo primero, 29 LPRA sec. 185a, establece que: (1) todo empleado, el comercio, industria o cualquier otro negocio o sitio de

empleo y (2) contratado sin tiempo determinado y mediante remuneración de alguna clase, tiene derecho a recibir una indemnización de su patrono cuando lo despide sin justa causa. El resarcimiento al que tiene derecho el empleado es la mesada y constituye un remedio exclusivo, cuando el despido es injustificado. No obstante, no existe una prohibición absoluta en contra del despido. Los empleados pueden ser despedido por justa causa. La Ley Núm. 80, *supra,* cumple los dos propósitos primordiales de: (1) desalentar la práctica de despedir a empleados sin justa causa y (2) proveer a los empleados remedios consustanciales a los daños que les ocasiona el despido injustificado. *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 770-771 (2022).

Aunque la Ley Núm. 80, *supra,* no define concretamente lo que constituye despido injustificado, si expone ilustrativamente las instancias en las que se justifica el despido. El Art. Núm. 2, 29 LPRA sec. 185b, establece como justa causa, razones atribuibles a la conducta del empleado como que: (1) ha exhibido un patrón de conducta impropio o desordenado, (2) no ha cumplido con sus labores de manera eficiente, (3) ha realizado tarde o negligentemente su trabajo, o en violación a las normas aplicables, (3) ha violado reiteradamente aquellas reglas y reglamentos razonablemente establecidos para la operación del establecimiento, los cuales le han sido suministrados oportunamente. Sin embargo, no se considera que existe justa causa, cuando el despido es producto del capricho del patrono y no hay una razón relacionada al buen y normal funcionamiento del establecimiento. La ausencia de razonabilidad en las exigencias que el patrono impone al empleado pueden convertir el despido en injustificado. *Ortiz Ortiz v. Medtronic,* supra, págs. 771-772.

La enumeración de escenarios incluidos en la Ley Núm. 80, *supra,* no es taxativa. La ley no dispone un mínimo de

amonestaciones previas a que el patrono pueda despedir a un empleado justificadamente, ni exige que se haga de determinada forma. Tampoco establece un código de conducta con una lista de faltas claramente definidas, al igual de las sanciones a que cada una corresponde. No obstante, todo contrato de empleo contiene expresa o implícitamente que el empleado tiene que cumplir con los deberes del mismo de forma competente. Los patronos pueden aprobar reglamentos internos y establecer las normas de conducta en el lugar de trabajo que estimen necesarias. Los empleados estarán sujetos a su cumplimiento, siempre y cuando sean razonables. Las violaciones de las normas del empleo son justa causa para el despido, cuando el patrono demuestra que: (1) las reglas establecidas para el funcionamiento del establecimiento son razonables, (2) le suministró una copia escrita de dichas normas al empleado, y (3) el empleado las violó en ocasiones reiteradas. *Ortiz Ortiz v. Medtronic,* supra, págs. 773-774.

La Ley Núm. 80, *supra,* establecía la presunción de que todo despido es injustificado. No obstante, la Ley de Transformación y Flexibilidad Laboral eliminó la frase que le impone el peso de la prueba al patrono. Sin embargo, los empleados contratados con anterioridad a la vigencia de esta enmienda continuarán disfrutando los mismos derechos y beneficios que tenían previamente. *Ortiz Ortiz v. Medtronic,* supra, págs. 774-775.

### Ley para Prohibir el Hostigamiento Sexual en el Empleo, Ley Núm. 17 de 22 de abril de 1988, 29 LPRA sec. 1555 y siguientes

Puerto Rico tiene la política pública de erradicar el hostigamiento sexual, debido a que esa conducta constituye una forma de discrimen por razón de sexo que atenta contra la dignidad del ser humano. La Ley Núm. 17, s*upra,* fue legislada con el propósito de adoptar e implantar esa política pública, ya que prohíbe dicha conducta e impone responsabilidad al patrono. El legislador

responsabilizó a los patronos por los actos de hostigamiento sexual en los que estos o sus supervisores incurran. Además, es responsable por el hostigamiento sexual entre sus empleados, siempre que supiera o debiera estar enterado de tal conducta. Únicamente será eximido de esa responsabilidad, si prueba que tomó una acción inmediata y apropiada para corregir la situación. Arts. 5 y 6, 29 LPRA secs. 155 (d) y (e). Una acción inmediata y apropiada es aquella que razonablemente terminará sin demoras los actos de hostigamiento sexual y evitará su repetición de manera efectiva. No obstante, para determinar si la acción es inmediata y apropiada, hay que examinar las circunstancias particulares de cada caso, si existe un reglamento aplicable a la situación y su cumplimiento. *Casillas Carrasquillo v. ELA*, 209 DPR 240, 250 (2022).

El patrono es responsable de prevenir, prohibir y erradicar el hostigamiento sexual en el empleo. Así se dispone expresamente el Art. 10, 29 LPRA sec. 155i. Según dicho artículo, está obligado a: (1) mantener el centro de trabajo libre de hostigamiento sexual e intimidación, (2) exponer claramente su política contra el hostigamiento sexual ante sus superiores y empleados, (3) garantizar que se pueda trabajar con seguridad y dignidad, (4) tomar las medidas necesarias o convenientes con el propósito de prevenir, desalentar y evitar el hostigamiento sexual incluyendo, pero sin limitarse a las siguientes:

    a. Expresar claramente a sus supervisores y empleados que el patrono tiene una política enérgica contra el hostigamiento sexual en el empleo.

    b. Poner en práctica los métodos necesarios para crear conciencia y dar a conocer la prohibición del hostigamiento sexual en el empleo.

    c. Dar suficiente publicidad en el lugar de trabajo, para los aspirantes a empleo de los derechos y protección que se les confieren y otorgan bajo las secciones 155 a 155 m de este título, al amparo de las secciones 1321 a 1341 de este título, las secciones 146 a 151 de este título y de la Constitución de Estado Libre Asociado de Puerto Rico.

    d. Establecer un procedimiento interno adecuado y efectivo para atender querellas de hostigamiento sexual. 29 LPRA sec. 1551i.

El Art. 10, *supra*, no obliga al patrono a adoptar un reglamento en particular, sino que le brinda unas guías mínimas para que a su discreción implante una política efectiva en contra del hostigamiento. A cada patrono le corresponde tomar las medidas cautelares necesarias para evitar efectivamente el hostigamiento sexual en sus lugares de trabajo. La política pública del Gobierno de Puerto Rico contra el hostigamiento sexual en el ámbito obrero patronal es clara. El patrono tiene que tomar las medidas necesarias para cumplir cabalmente con el mandato de realizar actos afirmativos para desalentar este tipo de prácticas indeseables y promover activamente una política de prevención. *Casillas Carrasquillo v. ELA,* supra, pág. 251. Según lo dispuesto en el Art. 15 adicionado, 29 LPRA sec. 155n, el patrono también tiene la obligación de establecer un protocolo de hostigamiento sexual en el lugar de empleo.

**Ley contra el Despido Injusto o Represalia a todo empleado por ofrecer testimonio ante el foro administrativo, legislativo o judicial**
**Ley Núm. 115 de 20 de diciembre de 1991, 29 LPRA sec. 194**

Ningún patrono podrá despedir, amenazar o discriminar contra un empleado, porque ofrezca o intente ofrecer verbalmente o por escrito cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial. La prohibición se extiende al testimonio, expresión o información que el empleado ofrezca o intente ofrecer en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad. No obstante, las expresiones cobijadas no pueden ser difamatorias ni sobre información privilegiada protegida por ley. Quien alegue la protección de ley, puede instar su reclamación en un término de tres años desde que ocurrió la violación. Además de solicitar una compensación por los daños sufridos, las angustias

mentales, la restitución en el empleo, los salarios dejados de devengar, los beneficios y honorarios de abogado. Si la reclamación prospera, el patrono tendrá que pagar el doble de la compensación por los daños y salarios dejados de devengar. Art. 2, 29 LPRA sec. 194(a).

### Ley Núm. 100 de 30 de junio de 1959

La Ley Núm. 100, *supra*, creó una causa de acción dirigida a todo patrono que discrimine contra un empleado por razón de edad, raza, color, sexo, orientación sexual, identidad de género, origen social o nacional, condición social, afiliación política, ideas políticas o religiosas, ser víctima o ser percibida como víctima de violencia doméstica, agresión sexual o acecho, ser militar, exmilitar, servir o haber servido en las Fuerzas Armadas de Estados Unidos o ser veterano. 29 LPRA sec. 146. El legislador extendió al ámbito obrero patronal privado las protecciones contra el discrimen contenidas en nuestra Constitución. El objetivo principal del referido estatuto laboral es proteger a los empleados de la empresa privada de todo tipo de discrimen. La protección se extiende a los empleados de agencias o instrumentalidades de gobierno que operen como empresa privada. *Rivera Torres v. UPR,* 209 DPR 539, 548-549, 552 (2022). Se presumirá que cualquiera de los actos mencionados en las secciones precedentes fue cometido en violación de esta ley, cuando haya sido realizado sin justa causa. No obstante, esta presunción es controvertible. No se presume que el patrono estaba enterado de la situación personal de algún empleado en el caso de las víctimas de violencia doméstica, agresión sexual o acecho, a no ser que en efecto estuvo en posición de conocerlo. El patrono deberá ejercer los ajustes o acomodos razonables necesarios en el lugar de trabajo para proteger a sus empleados de un posible agresor, una vez haya sido avisado sobre la potencialidad de que ocurra una situación peligrosa. Art. 3, 29 LPRA sec. 148.

**III**

La Regla 52.1, *supra,* nos autoriza a expedir el recurso, porque el peticionario solicita que revisemos la denegatoria a una moción de carácter dispositivo. Nuestra intervención es necesaria porque un análisis de la totalidad de la prueba nos convence de que no existe controversia de hechos esenciales que impida desestimar sumariamente la demanda.

El peticionario alega que el TPI no tenía autoridad para atender la reclamación de discrimen por acciones concertadas, porque el foro con jurisdicción para atender esa controversia es la Junta Nacional de Relaciones del Trabajo.

El primer señalamiento de error es inmeritorio porque la propia recurrida alega que su reclamación no está basada en una alegación de discrimen sindical, ni en acciones concertadas. Su representación legal sostiene que su reclamo por discrimen en el empleo es al amparo de la Ley Núm. 100 del 30 de junio de 1959, conocida como Ley contra el Discrimen en el empleo, la Ley Núm. 115 de 20 de diciembre de 1991, Ley de Represalias contra el Empleado por Ofrecer Testimonio, y la Ley Núm. 80 de 30 de mayo de 1976, Ley sobre despidos injustificados.

El peticionario alega que el TPI erró al no desestimar sumariamente la reclamación por hostigamiento sexual. El patrono aduce que el foro primario concluyó equivocadamente que está en controversia, si el señor Orlando Vélez incurrió en conducta sexual no consentida. Igualmente cuestiona la conclusión de que existe controversia sobre el procedimiento para procesar las denuncias de hostigamiento sexual en el empleo. Su representación legal plantea que el foro primario erró al no desestimar la demanda, porque el hospital adjudicó el asunto a base de credibilidad.

La recurrida alega que existe controversia de hechos esenciales que impiden la desestimación sumaria de la controversia.

El peticionario tiene razón. El TPI cometió el segundo señalamiento de error. Luego de un análisis de novo, de toda la evidencia documental presentada, concluimos que no existe controversia de que: (1) la recurrida no fue hostigada sexualmente en su empleo, (2) la recurrida tuvo una relación sexual consentida con su supervisor, Orlando Vélez, en horas laborables, en el lugar de trabajo y fuera de este, (3) la recurrida no notificó inmediatamente los alegados actos de hostigamiento, (4) la recurrida no notificó la relación consentida que tenía con su supervisor, (5) la conducta de la recurrida y el señor Vélez violentó las normas establecidas en la reglamentación interna del Hospital Pavía y (6) el recurrido cumplió con la política de hostigamiento sexual en el empleo establecida en ley.

A diferencia del TPI concluimos que el procedimiento que siguió el patrono está clara y expresamente establecido en el Manual del Empleado. La recurrida firmó un contrato de empleo en el que se comprometió a cumplir las normas y reglamentos del hospital, incluyendo el Manual del Empleado. Véase, pág. 692 del apéndice. El peticionario tomó acción inmediatamente, una vez la recurrida informó la situación.

La reglamentación interna del hospital cumple con la política pública del Estado contra el hostigamiento sexual en el empleo. El hospital tiene una POLITICA CONTRA EL HOSTIGAMIENTO SEXUAL O DISCRIMEN DE CUALQUIER ÍNDOLE EN EL EMPLEO. Véase, pág. 743 del apéndice. El patrono incluyó la definición legal de HOSTIGAMIENTO SEXUAL. Así sus empleados están informados de que:

> Según definido por ley, el hostigamiento sexual en el empleo consiste en cualquier tipo de acercamiento sexual no deseado, requerimiento de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual, cuando se da una o más de las siguientes circunstancias:

(a) Cuando al someterse a dicha conducta se convierte, de forma implícita o explícita, en un término o condición del empleo de una persona.

(b) Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto al empleo que afecta a esa persona.

(c) Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño de trabajo de esa persona o cuando crea un ambiente de trabajo intimidante, hostil u ofensivo. Véase, pág. 743 del apéndice.

El Manual advierte a los empleados que es responsabilidad de todo el personal gerencial y de supervisión: (1) no incurrir en este tipo de conducta, ni crear un ambiente hostil en su área de trabajo; (2) velar porque no se incurra en hostigamiento, ni se cree un ambiente hostil en su área de trabajo por parte de cualquier otro empleado, paciente visitante, personal gerencial o de supervisión; (3) velar porque no se incurra en hostigamiento en cualquier área de trabajo del hospital o donde los empleados brinden servicios o desempeñen sus labores. Queda expresamente establecido que nadie en el hospital tiene autoridad para someter a ningún empleado, paciente o visitante a hostigamiento de clase alguna. Igualmente queda expresamente establecido que ningún empleado, paciente o visitante sin exclusión de género tiene que obligarse a someterse a tolerar actos de hostigamiento en el empleo, indistintamente del cargo o posición que ocupe el alegado hostigador. No obstante, se advierte que cualquier empleado o facultativo que entienda que ha sido hostigado tiene el deber de notificarlo inmediatamente. La misma responsabilidad tiene el empleado que tenga conocimiento y que haya sido testigo de un acto de hostigamiento. El Manual establece expresamente, que la falta de informar con prontitud un acto de hostigamiento, violenta la política del hospital. Igualmente deja meridianamente claro que el hospital mantiene cero tolerancias a conducta que de por sí sola o por su efecto en conjunto puede configurar una violación a la política

contra el hostigamiento sexual en el empleo, independientemente de que se configure o no un acto de hostigamiento para efectos de la ley. Véase, págs. 744-745 del apéndice.

Según lo dispuesto en el Manual del Empleado, el procedimiento para la presentación de la reclamación o querella es el siguiente:

(a) Reportar el problema inmediatamente al Supervisor inmediato, Coordinador de Recursos Humanos, o Director Ejecutivo, quien procederá a investigar el caso.

(b) Durante el proceso de la investigación se podrán tomar medidas preventivas necesarias.

(c) No se discriminará contra un empleado por presentar un caso de esta naturaleza o haber servido de testigo.

(d) Todo empleado que se sienta hostigado sexualmente deberá presentar una reclamación o querella a su supervisor inmediato o al Coordinador o Supervisor de Recursos Humanos, según el empleado desee.

(e)  Esta querella puede ser verbal o escrita.

(f)  El querellante será informado de sus derechos y de los remedios disponibles en la ley y reglamentos aplicables. Véase, págs. 744-745 del apéndice.

El hospital, además, advierte a sus empleados en el manual que toda queja, información o notificación sobre alegados actos de hostigamiento será motivo de una pronta y minuciosa investigación de acuerdo con esa política. Al concluir la investigación, el hospital revisará las conclusiones y tomará la acción correctiva correspondiente que puede incluir hasta el despido. Véase, pág. 745 del apéndice.

El Manual informa a los empleados sobre la política sobre relaciones consensuales. Según lo establecido, es necesario notificar al Departamento de Recursos Humanos de toda relación que pueda afectar potencialmente sus operaciones. Ningún empleado, supervisor, ejecutivo u oficial puede establecer una relación consensual íntima y amorosa con personal de la institución, mientras uno de los dos este casado. Si ambos son solteros y uno está bajo la

supervisión directa o indirecta del otro, será obligatorio notificarlo inmediatamente al Departamento de Recursos Humanos. La obligación de notificar se extiende al compartir dentro o fuera de horas laborables, así como dentro y fuera de los predios del hospital. La falta de notificación inmediata podrá conllevar sanciones disciplinarias serias, incluyendo el despido inmediato de ambos o del empleado de mayor jerarquía. Véase, pág. 745 del apéndice.

El procedimiento que siguió el hospital para atender la querella de hostigamiento sexual en el empleo cumplió con la política pública en contra del hostigamiento sexual en el empleo y con lo establecido en el Manual del Empleado. El hospital atendió el reclamo de la recurrida tan pronto lo presentó. Fue la recurrida quien tardó en hacer la querella. El peticionario tomó acción inmediata y apropiada, una vez tuvo conocimiento de sus alegaciones. El hospital le dio oportunidad de expresarse y escuchó a la otra parte y entrevistó a las personas sugeridas por la recurrida. El procedimiento seguido fue el siguiente.

El 12 octubre de 2018, la recurrida declaró en el formulario de REUNIONES Y/O ENTREVISTA sobre una situación de Hostigamiento sexual de parte de su supervisor, Orlando Vélez. La señora Rosa comentó que el 6 de octubre, el señor Vélez se sacó el pene y se masturbó frente de ella y que no era la primera vez que lo hacía. La recurrida se negó a presentar una querella escrita, porque se le hacía difícil. Fue informada que el asunto sería referido al Departamento de Recursos Humanos. El entrevistador hizo constar que: (1) entregó la entrevista documentada, según referido por la recurrida, (2) certificó que lo documentado en la primera página era correcto, (3) la recurrida certificó verbalmente que lo documentado era correcto, (4) la recurrida le mostró unos mensajes de texto en los que el señor Vélez le hizo unos acercamientos e invitaciones, (5) la recurrida alegó que había otras personas envueltas y que, por temor, no se atreven a expresarlo,

(6) la recurrida mencionó que Jesuaris Bonet, Nanichy Torres, Nishma de Jesús y que Milessa Rivera tenían conocimiento. El documento está firmado por el entrevistador y dos testigos. Véase, págs. 829-830 del apéndice.

El entrevistador cumplió con el documento titulado SITUACIÓN QUE INTERPRETA EN LA QUERELLANTE COMO HOSTIGAMIENTO SEXUAL. Según consta en ese documento, la recurrida dijo lo siguiente:

(1) El hostigamiento sexual comenzó el día que el señor Vélez celebró su cumpleaños número 50 en un local en Lares, e invitó a personal del hospital. Sin embargo, no pudo precisar la fecha. Vélez estaba bastante tomado y estuvo todo el tiempo detrás de ella. Luego de terminar la fiesta le pidió ayuda a ella para transportar unas cosas. Vélez no la dejaba alejarse, le insistía que no se fuera y le dijo que el 50% de su evaluación dependía de la ayuda que le estaba dando.

(2) Durante horas laborables y en el trabajo, Vélez la rozaba con sus partes, se le pagaba demasiado cuando iba a contestar o hablar por teléfono, le pedía que pusiera el speaker para acercarse y tocarla, no la dejaba salir de la oficina para nada, le pidió que buscara unos implantes en un almacén, cerró la puerta, se le acercó y trató de besarla. Ella lo empujó y él aguantó la puerta para evitar que saliera.

(3) Nunca antes había hablado de la situación, no pudo precisar las fechas exactas de los eventos y le indicó con gestos a Vélez que su conducta no le agradaba.

(4) Vélez se ha comportado como si fuera su marido, le grita como si fuera algo más.

(5) Ella le dijo por mensaje de texto a Vélez que no tenía que gritarle ni tocarla. Vélez le contestó el mensaje, no le pidió perdón, pero le escribió como si estuviera asustado. No obstante, no tiene el mensaje porque fue con otro teléfono.

(6) A la pregunta de si el señor Vélez le ha hecho acercamientos directos, contestó que no, que solo han sido acercamientos físicos. Su conducta más explícita fue después de María.

(7) Ha observado a Vélez con el pene erecto.

(8) A finales de septiembre de 2018, Vélez le pidió que le tomara la presión y mientras lo hacía, le aguantó las manos.

(9) Vélez la trata como si fuera su novia.

(10) La señora Milessa Rivera presenció un incidente en el que Vélez se le pegó frente con frente.

(11) El 16 de septiembre de 2018 a las 6:34 pm le escribió un mensaje de texto de Vélez para decirle que se ausentaría al día siguiente, intercambiaron varios mensajes. Él la llamó para que se encontraran en la Casona. Ella acudió y compartieron y jugaron billar. Vélez le compró una cerveza. Cuando salieron, la siguió en su carro. Vélez se detuvo en un área oscura. Ella se detuvo y bajó el cristal. Vélez entró su cara y la besó a la fuerza.

(12) A finales de septiembre, le tomó la presión a Vélez. Él estaba masturbándose con el pene visible hacia ella.

(13) Un incidente similar ocurrió en el mes de octubre.

(14) No le ha dicho nada a Vélez, porque se le hace bien difícil.

(15) No entiende que Vélez interprete que ella está consintiendo, porque tiene una compañera.

(16) No refirió la situación antes, porque le preocupaban sus estudios de leyes y le asustaba que Vélez tomara una acción contra sí.

(17) No tiene ningún testigo de los incidentes de violencia doméstica, pero otras compañeras le han mencionado de incidentes con Vélez.

(18) Jesuaris le ha dicho que Vélez la ha rozado.

(19) Nanishi que le hizo un comentario sobre su trasero.

(20) Nishma le ha comentado que la roza y que una vez le dio una patada en la espinilla.

(21) Previo a esta notificación no había hablado con nadie de estos eventos.

(22) Su evidencia son seis fotos de los mensajes de texto entre ella y Vélez.

(23) Los roces de Vélez continúan.

Véase, pág. 831 del apéndice.

El hospital orientó a la recurrida que:

1. Procedería con la investigación correspondiente siguiendo el proceso establecido en el hospital.

2. El proceso era confiable.

3. Sería informada de las medidas aplicables correspondientes, una vez concluyera la investigación. Se le exhortó a evitar comunicación con Vélez y a informar inmediatamente cualquier situación.

4. Se tomarían medidas preventivas.

5. Debía presentarse a la Oficina de Recursos Humanos para recibir instrucciones y no reportarse a la Sala de Operaciones.

El documento antes aludido está firmado por la recurrida y dos testigos.

El 18 de octubre de 2018, el hospital se reunió con la recurrida para preguntarle cómo se encontraba y si el querellado había intentado comunicarse con ella. La recurrida contestó que se sentía bien y que el querellado no le había hecho ningún acercamiento. La señora Rosa entregó por primera vez una carta con fecha del 28 de junio de 2018. Su texto es el siguiente:

*28 de Junio de 2018*

*Para tomarme la iniciativa de referir la siguiente situación, debe ser porque me encuentro o me siento que me han llevado a un límite extremo en mi lugar de trabajo. Realmente, por las situaciones que he experimentado como mujer, es incluso muy difícil para mí hablar de este tema. Siendo esta una de las razones por las cuales no había realizado un referido anteriormente.*

*Como debe surgir de mi expediente, hace aproximadamente dos años fui víctima de violencia doméstica. Estuve casada con un hombre que literalmente llevó mi vida a la mediocridad. Fui manipulada por él y maltratada tanto física como emocionalmente. Me vi en un ciclo de complacer todas sus órdenes por miedo a todo el daño que este podía hacerme, inclusive poder que este tenía de lograr cortar mi entrada económica a mi hogar, para verme a mí y a mis hijas despojadas de todo.*

*Cuando la vida física y emocional de mis hijas y la mía se vio más comprometida aún, tuve el valor de romper esa relación. Tuve el valor de denunciar todos los hechos. Pero, debido al poder legal y político que mi ex esposo ha poseído, este ha logrado desquitarse de mis querellas con acciones deplorables que me han costado dinero, tiempo, horas de sueño e incluso mi reputación. He perdido mucho. Perdí credibilidad, perdí apoyo. Lo único que conseguí fue ver como él manejaba todo a su favor, como sus conexiones y su "importancia" mayor a la mía, gozaba del apoyo de la sociedad.*

*Aunque salí de esa relación, aún luego de dos años, continuo inmersa en esta lucha legal por hacer valer mis derechos y los de mis hijas. Mi caso se encuentra siendo trabajado por personal de la Fiscalía de San Juan. Sin embargo, aunque tengo mis últimas esperanzas puestas en este personal para conseguir aunque sea un poco de justicia, algo que ellos no lograrán, es devolverme mi*

*integridad como mujer y la fortaleza para decir que no. Ese personal no me ayudará **<u>a no sentir</u>** la obligación de hacer lo que un hombre me pida. Tampoco me ayudarán a borrar el tener miedo. Miedo a ser pisoteada nuevamente.*

*Se me hace tan difícil hablar de esto, que pasar de un párrafo a otro me cuesta mucho tiempo, mis manos tiemblan, y siento una casi incontrolable ganas de llorar, pero a la vez, siento tanto coraje, que es lo que evita que llore en este momento. No sé cómo exponer esto. Porque ya una vez, como expliqué arriba, un hombre con mayor poder que yo, logró llevarme a la miseria y no escatimó en esfuerzos y dinero, para "hacerme comer mierda" como prometió el día que terminé con él.*

*Ahora en mi trabajo, he estado nuevamente expuesta a algo bastante parecido. Situación que se ha salido de mis manos.*

*El pasado 17 de junio do 2017, yo asistí al cumpleaños de mi jefe, el Sr. Orlando Vélez. Pensé que los demás compañeros del departamento e incluso del Hospital, asistirían. Pero no fue así. Al percatarme de que era la única del departamento, intenté irme, ya que solo había ido a la actividad porque pensé que lo correcto era que como secretaria de Orlando, asistiera con mis compañeros a la actividad. Al tratar de irme, la hija de mi supervisor me insiste que me quede, por lo que procedía(sic) a bajarme de la guagua. Desde el momento en que mi jefe me vio, arreglada de manera diferente a como suelo presentarme al trabajo, este no perdió oportunidad para, en repetidas ocasiones, dejarme ver que estaba muy impresionado por la manera diferente en que yo lucía. No dejaba de estar al pendiente de mí.*

*Al finalizar la actividad, me despedí en varias ocasiones, pero Orlando insistía en que no podía irme. Me comprometió indicando que no tenían ayuda para llevar las cosas del local, y que en mi guagua podrían(sic) hacer facilitar las cosas. Me quedé ayudando. Pero, en un momento dado, yo hice un comentario "jocoso" en contestación a algo que me habían preguntado y Orlando me escuchó y se molestó mucho y me gritó fuertemente y me miró de manera autoritaria. Me gritó que me callara, traté de hablar nuevamente, y Orlando volvió a gritarme que me callara, "quédate calladita", fueron(sic) una de sus expresiones.*

*Desde ese momento, comencé a hacer prácticamente todo lo que él me pedía. Me habló casi de la misma manera intimidante en que me hablaba mi ex esposo. Regresé a ese ciclo de no poder negarme a cualquier cosa que este propiciara.*

*Orlando comenzó a tener acercamientos sexuales hacia mí en el Departamento de Sala de Operaciones. Varias veces me hacía ir al área del almacén del departamento, dándome instrucciones de buscar algún material o verificar alguna información. Cuando yo llegaba al almacén, se aparecía Orlando y cerraba la puerta y comenzaba a llevarme con su cuerpo contra una de las paredes para*

*evitar que yo saliera y comenzaba a tener acercamientos sexuales. En algunas ocasiones, yo lo empujaba para alejarlo, pero él era más fuerte y más insistente. En otras ocasiones, no puedo negar que me dejé llevar. Estaba bastante confundida. La realidad es que yo jamás me imaginé envuelta de alguna manera como esta con Orlando. La verdad es que debo admitir que como hombre y/o sexualmente él se me hace repugnante. Muchas veces tenía un olor muy alto a alcohol. A pesar de esto, él era muy insistente. En la oficina, buscaba la manera de pegarse a mí.*

*En varias ocasiones, mientras yo atendía alguna llamada, este comenzaba a tener acercamientos sexuales "mientras" yo estaba atendiendo la llamada. Yo quitaba sus manos de encima de mí y lo miraba seria, para que se detuviera, pero él continuaba.*

*Era difícil decirle no a Orlando. En varias ocasiones, mínimo dos ocasiones, cuando yo me dirigía a mi casa, le envié mensajes indicándole que no volviera a tener esos acercamientos conmigo. Que de frente se me hacía difícil detenerlo, pero que no estaba cómoda con esa situación que no me hacía sentir bien.*

*Yo tenía miedo a qué ocurriría si le decía que no. Miedo a que se molestara conmigo, a que yo ya no fuese útil en mi trabajo. Miedo a perder mi trabajo.*

*En dos ocasiones, mientras yo estaba realizando algún trabajo en mi escritorio, Orlando se me acercó, al yo estar sentada y él de pie, su parte íntima quedaba a la altura de mi rostro. Este comenzaba a pegarse a mí, y yo estaba arrinconada en el escritorio. Insistía su acercamiento en silencio, buscando recibir sexo oral por mi parte. No lo hice. Me producía asco. Opté por complacerlo con mis manos, para lograr que se fuera y dejara de insistir.*

*A pesar de que le pedí por mensajes varias veces que me dejara tranquila, que no volviera a tener esos acercamientos, él continuaba. Hasta que comencé a optar por levantarme de mi silla en cuanto percibía que él venía para la oficina. Luego comencé por pasar el mínimo tiempo posible en la oficina mientras él estaba. El entraba y yo buscaba la manera de salir.*

*Para las navidades, me ofrecí a ayudar a otras de las secretarias a decorar la cafetería para la actividad de los empleados. Yo necesitaba salir del Departamento, hacer cosas diferentes. Orlando no me dejaba salir. Cuando le comenté que al próximo día yo iría a decorar, y que incluso yo había traído la decoración, este se puso histérico en la oficina. Me gritó que yo no tenía que ir para allá a nada. Que decorar no era parte de mis tareas como secretaria. Que no iba y punto. Me quedé callada. No podía contra su imponencia.*

*Yo hablé con la secretaria de Recursos Humanos y le pedí que hablara con Yesenia Natal para que esta me sacara permiso con mi jefe para yo poder ir a decorar. Y aunque entiendo que Yesenia lo intentó, no logró hablar con*

*Orlando. Pero al próximo día, me llené de valor, él no se encontraba en el departamento, estaba en alguna otra parte del Hospital. Le envié un mensaje al celular diciéndole que yo tenía todas las cosas de la oficina al día, que no había absolutamente nada pendiente. Que yo no salía nunca fuera del departamento a participar de nada. Que iba a bajar. Que si estaba en desacuerdo, me lo dejara saber, que si no recibía contestación, iba a entender que no tenía objeción. Me fui a ayudar con la decoración y nunca recibí mensaje de Orlando.*

*No fue la primera vez que me atreví a confrontarlo por algo parecido. Orlando no me dejaba salir del Departamento, me quería todo el tiempo en la oficina. Yo tenía que sacar todas sus tareas administrativas. Era como ser un ama de casa sumisa, pero esta vez con mi jefe. Llegó un momento en que me sentía abrumada. Me levanté, me fui al vestidor y me cambié y me fui. Yo le envié un mensaje a Orlando indicándole que si tenía que recibir un warning por haberme ido o una suspensión, que lo hiciera. Pero que yo ya estaba cansada y abrumada. El comenzó a contestar mi mensaje y mantuvimos una comunicación al respecto. Los próximos días, él cambió bastante. Ya no me gritaba, era más sereno y mostraba respeto hacia mí como empleada. Pero luego, pasaba de ser un gran ser humano, a ser el jefe que me gritaba por cualquier cosa. En varias ocasiones he levantado bandera sobre la manera en que Orlando se ha dirigido hacia mí. Y solamente lo entrevistan, y como él dice cualquier excusa, es suficiente para que mi queja no tenga ningún tipo de validez.*

*Luego, no sé si fue porque se percataron, pero varias empleadas comenzaron a buscarme conversación en la oficina, y comenzaron a contarme varias historias muy incómodas que ellas mismas habían experimentado con Orlando, u otras me contaban historias que ellas conocían sobre Orlando y otras personas. Pero no solo eso, comenzaron a contarme historias sexuales de diferentes empleados del departamento. Estas historias me confirmaban que, de ser ciertas, era yo la que me encontraba en desventaja, que no podría presentar una queja, porque es muy normal tener este tipo de prácticas en el hospital.*

*Pensé en las ocasiones en que referí la situación en que una compañera del departamento se dirigió a mí expresándose de una manera sexualmente implícita, y a pesar de yo haberme quejado de esto, nadie nunca hizo nada. Ignoraron esta situación. Entendí por qué fue así. Porque al parecer el acoso sexual en el Hospital se prefiere mantener oculto y sin ningún tipo de consecuencias.*

*Yo comencé a limitar mi relación con mis compañeros(as) del trabajo. Ya no quería escucharlos contarme sus historias, y ver como luego ninguno era lo suficientemente íntegro para mantener sus versiones ante Recursos Humanos, quedando yo en ridículo. Ya había experimentado cómo los empleados, por razones que desconozco, no se atreven a decir la verdad y yo no tengo manera de obligarlos. También comencé a marcar una distancia importante entre Orlando y yo. Me limitaba a*

*recibir sus instrucciones como supervisor y a realizar y entregarle mi trabajo. Me mantenía seria y distante, como al principio. Como antes de que este comenzara con sus acercamientos sexuales.*

*Pero el pasado miércoles, 27 de junio de 2018, me llama del Departamento de Enfermería la Sra. Toledo y me pide que pase por su oficina. Al llegar, me sorprendo al ver que Orlando se encontraba allí. Cuando comienzan a hablar, supe de qué se trataba. Orlando Vélez estaba presentando una queja, estaba "incómodo" y cito literalmente sus palabras: "Ella ya no se comunica conmigo como antes. Antes teníamos excelente relación y ahora es nula. La comunicación es negativa". Sin embargo, me atreví a hacerle varias preguntas frente a la Sra. Toledo. Orlando no pudo hablar una sola cosa negativa sobre mi trabajo. Aceptó que me daba tareas y yo las realizaba, que si yo tenía dudas, le hacía preguntas. La realidad es que mi comunicación laboral con Orlando no cambió. Simplemente limité a nulo cualquier comunicación "no laboral", y entiendo que era esto lo que le causaba frustración. Ese tipo de confianza que se atrevía a tener conmigo y que ya le había cortado por completo. Lo que pasó es que se le ha hecho difícil entenderlo, porque no he tenido el valor de decirle de frente porque(sic) este cambio. No me atrevo. Me da miedo que entonces haga o diga algo para que yo pierda mi trabajo.*

*He insistido en permanecer en mi Departamento trabajando, porque las veces que me he quejado, lo que he recibido han sido amonestaciones, todo lo que yo refiero, redunda en algún acto de represalia contra mí. El hecho de pedir algún cambio de departamento, entendí que se vería como una manera de disciplinarme por presentar mi queja. Ya una vez mi ex esposo me hizo pasar la peor de las experiencias en mi vida, y ha utilizado todos los medios a su alcance para que(sic), de manera ilegal, hacerme pagar por terminar la relación con él. Lo ha logrado. Estoy viviendo un infierno. Él no se ha detenido. Y pensaba que si me movían de mi departamento, era como otorgarle también a Orlando una recompensa por haberme llevado a aguantar estos extremos.*

*Pero ya estoy cansada, y ya no puedo más. Llegar y mantenerme en el trabajo para mí es toda una osadía. Es un reto.*

*Hace unos meses, le comenté al Director de Seguridad, Iván Jiménez, que me había percatado de que a las 7:00am ya no había un guardia en el área de la caseta del estacionamiento de empleados, y que había visto como una empleada del hospital, le dio a una persona que no es empleado del hospital, acceso al estacionamiento. Esto para mí fue trágico. Otra muestra de que en el Hospital no existe para nada ninguna protección para mí. Que el hospital está al tanto de que fui víctima de violencia doméstica, y que, aunque ya no hay una orden de protección activa, no dejo de estar expuesta a las represalias de mi ex esposo. Así como esta persona tuvo acceso al estacionamiento, pudo haber sido mi ex esposo quien pudo haber tenido el mismo acceso. Ya una vez una*

*persona logra entrar al estacionamiento, es sumamente fácil entrar al hospital. Pregúntenle a Iván Jiménez ¿qué hizo con mi referido? NADA. Aún sigue igual la misma práctica. El área do acceso al estacionamiento en la hora más crítica (7:00am) está desprotegida.*

*Pregúntenle al personal del Departamento de Enfermería o al personal de Recursos Humanos, ¿qué hicieron con mi queja contra la empleada Edel López quien decidió en un momento dado explicarme su convicción de que yo me metía el pene de mi esposo a la boca y lo chupaba, tal y como ella lo hacía con el frosting del bizcocho que se estaba comiendo en esos momentos?. Pregúntenle al personal del Departamento de Enfermería a al de Recursos Humanos, ¿qué hicieron con mi queja en contra de Orlando por este comunicarse en varias ocasiones con gritos hacia mí? ¿Era necesario yo pasar por esta vergüenza de contar todo esto, para que entiendan porqué(sic) NO ESTA BIEN QUE UN SUPERVISOR LE HABLE DE ESA MANERA A UNA EMPLEADA? ¿Era necesario yo atormentarme de esta manera al escribirles en detalle todo lo ocurrido, para que entendieran que NO ES COMODO QUE UNA COMPAÑERA ME EXPLIQUE SU POSTURA DE QUE YO LE CHUPO EL PENE A MI ESPOSO?.*

*Estoy al borde de lo que puedo soportar como ser humano.*

*Y tener que escribir mi nombre en este papel, no es fácil. Que alguien luego de leer este relato humillante, vea mi nombre asociado con estos hechos, no es cómodo.*

*Sandra E. Rosa Rodríguez*
*Dpto. de Sala de Operaciones*

Véase, pág. 845 del apéndice.

Durante su entrevista, Vélez admitió que en una ocasión salió a compartir con la recurrida a un negocio y se dieron un beso consentido. Según su versión, luego de su cumpleaños, la recurrida le dijo que estaba lista para que hiciera con ella lo que le diera la gana, pero había perdido la oportunidad. Vélez admitió que se besaron en el almacén de materiales del hospital, pero negó que fuera a la fuerza. Fue cuestionado sobre el incidente en que la recurrida alegó que se masturbó mientras le tomaba la presión. Vélez dijo que fue la recurrida la que comenzó a tocarlo y admitió que eso ocurrió en dos ocasiones. Fue enfático en que la recurrida era quien comenzaba. Vélez alegó que la recurrida lo incitaba y que él le manifestó su temor a que le hiciera una querella. Se le preguntó por qué no informó sobre

los acercamientos de la recurrida. Vélez contestó que entre ellos existía una relación cordial como personas solteras. Además, de que la recurrida nunca le expresó inquietud ni molestia y él nunca la obligó. Véase, pág. 849 del apéndice.

El hospital entrevistó a Jesuaris Bonet Rosa, Nanishi Torres y Nishma De Jesús Maisonet, a quienes la recurrida mencionó que Vélez le había hecho acercamientos sexuales no deseados. La señora Bonet negó haber presenciado que Vélez incurriera en conducta impropia hacia la señora Rosa. Igualmente negó que Vélez le hubiese hecho a ella un acercamiento de connotación sexual y describió su trato como de respecto. Bonet dijo que Vélez la trataba con respeto. Además, negó haber manifestado ningún asunto mediante mensaje de texto ni verbal de la señora Rosa. Véase, pág. 852 del apéndice.

Nishma De Jesús Maisonet negó haber presenciado alguna conducta impropia de Vélez hacia la recurrida. También negó que Vélez hubiese incurrido en conducta impropia de connotación sexual hacia su persona. Además, dijo que Vélez la trataba con respeto. La señora De Jesús alegó que la recurrida se quejaba de que Vélez se perdía y había mucho trabajo y de que no la defendió y permitió que le realizaran un reporte. Véase, pág. 853 del apéndice.

Nanishi Torres negó tener conocimiento de que Vélez cometiera conducta impropia contra la recurrida o que hubiese recibido información de parte de ella. Igualmente negó que Vélez haya actuado de forma impropia y con connotación sexual hacia su persona. Según la señora Torres, Vélez la trataba con respeto. Además, dijo que la recurrida comentó en un chat que Vélez estaba en un negocio, se tomó un par de tragos y estaba graciosito, pero no dijo que le faltó el respeto. Véase, pág. 859 del apéndice.

La señora Milessa Rivera Cubero negó haber presenciado conducta impropia de parte del señor Vélez hacia la recurrida. Rivera dijo estar sorprendida porque no presenció que Vélez se pegara frente

con frente a la recurrida, como ella alegó. Véase, pág. 857 del apéndice.

El 31 de octubre de 2018, el hospital informó a la recurrida su determinación, luego de concluida su investigación. El peticionario le señaló una serie de inconsistencias en su testimonio, que restaban credibilidad a su versión de los hechos. El hospital encontró inconsistencias en las razones que dio para no notificar el hostigamiento oportunamente. Según el peticionario, el 12 de octubre de 2018 dijo que no comunicó su queja oportunamente, debido a que estaba preocupada por sus estudios de leyes y tenía miedo de que Vélez tomara una acción contra el mismo. Sin embargo, el 18 de octubre de 2018 alegó que tenía miedo de lo que le pudiera pasar en su lugar de trabajo. El hospital no dio credibilidad a esta última versión, porque en el pasado presentó múltiples quejas verbales y escritas contra sus supervisores, una coordinadora y otros empleados por múltiples asuntos. Fue enfático en que la recurrida presentó esas quejas sin temor alguno y en que no hubo ninguna consecuencia sobre su persona. Además, enfatizó que incluso se quejó contra Vélez, y que esas quejas fueron atendidas sin consecuencia alguna en su contra.

Al hospital tampoco le mereció credibilidad el alegado temor de confrontar a Vélez, porque de sus propias declaraciones surge que, lo confrontó en muchas ocasiones. Según el hospital, la recurrida incluso admitió que actuó en contra de las instrucciones de Vélez y que se fue del trabajo sin su autorización. Fue enfático en que esas confrontaciones tampoco conllevaron consecuencias en contra de la recurrida. El hospital no creyó que la recurrida se sintiera obligada a incurrir en la conducta llevada a cabo en el lugar de trabajo, ni las razones que dio para no quejarse inmediatamente ocurrieron los hechos.

Según el hospital, la recurrida admitió por escrito que se dejó llevar y optó por complacer al señor Vélez con las manos, mientras estaban en el lugar de trabajo. Además de que, conforme a su testimonio, han sido múltiples los incidentes de intimidad en horas laborables y dentro del hospital, por más de un año, sin quejarse al respecto. El hospital advirtió a la recurrida que sus admisiones configuraron una conducta impropia e inmoral en horas laborables y en los predios de la institución. Por otro lado, concluyó que los mensajes de textos provistos por la propia recurrida evidencian su consentimiento a encontrarse a solas con su supervisor fuera de horas laborables, beber cerveza y jugar billar. Fue enfático en que esa salida ocurrió en una fecha posterior a los alegados ataques sexuales. El hospital hizo a la recurrida la severa advertencia de que tomaría medidas disciplinarias que podían incluir el despido, si incurría nuevamente en conducta sexual consentida en el trabajo o no reportaba inmediatamente cualquier conducta de índole sexual en el trabajo. La recurrida fue transferida al área de Vacunación.

El 22 de mayo de 2023, la Supervisora de Recursos Humanos del hospital suscribió una declaración jurada en apoyo a la sentencia sumaria. La señora Janira Hernández Abrahams certificó que:

5. basado en la información y evidencia obtenida como parte de la investigación, el 18 de octubre de 2018, el Hospital Pavía Arecibo tomó la decisión de prescindir de los servicios del señor Orlando Vélez por motivos de su conducta impropia al mantener una relación sentimental consensual con la señora Rosa Rodríguez quien era su subordinada al momento de los hechos que se alegaban, y por no haberlo informado a la administración.

6. tras haber finalizado la investigación y haber analizado la información y evidencia obtenida, el Hospital Pavía Arecibo no le otorgó credibilidad al testimonio de la Sra. Rosa con relación a su queja por alegado hostigamiento sexual por parte del señor Orlando Vélez.

7. basado en los resultados de la investigación, se concluyó que la conducta impropia reportada por la señora Rosa había sido consentida y que ella y el señor Orlando Vélez habían mantenido una relación sentimental consensual.

8. como resultado de la investigación, le advertimos a la Sra. Rosa que si volvía a incurrir en conducta de índole sexual consentida en el trabajo o de no reportar de inmediato cualquier conducta de índole sexual en el trabajo se tomarían las medidas disciplinarias correspondientes, las cuales podrían incluir el despido. También le notificamos que en la institución no podíamos tolerar que se suscitaran este tipo de actos, fueren o no consentidos.

Un análisis de novo de la totalidad de la prueba, nos convence de que la recurrida se circunscribió a alegar que los acercamientos de Vélez no fueron deseados y que fue víctima de hostigamiento sexual en el empleo. Su versión de los hechos, no nos merece credibilidad. La conducta que le imputa a Vélez contrasta significativamente con todos los elogios que le hace en su carta de renuncia. La señora Rosa alega que Vélez le hizo acercamientos no deseados **el 17 de junio de 2017. Sin embargo, en su carta de renuncia del** 8 de noviembre de 2017 expresó su tristeza por dejar de ser parte del equipo de trabajo de Orlando Vélez en Sala de Operaciones y reconoció que había sido una experiencia gratificante y de mucha enseñanza, el trabajar en Pavía y más allá en el Departamento de Sala de Operaciones. La recurrida agradeció de manera especial a Orlando Vélez por enseñarle todo lo que logró aprender sobre el área clínica, por confiar en ella desde el primer día en que le dio la oportunidad de pertenecer a su equipo y por apoyar que sea una mejor profesional cada día. Véase, pág. 819 del apéndice. El 22 de noviembre de 2017 revirtió la renuncia, que estuvo motivada por asuntos personales y expresó su deseo de continuar brindando apoyo a sus compañeros de sala de operaciones, para que su departamento continúe trabajando de manera excelente. Véase, pág. 821 del apéndice.

Todas las entrevistadas por el hospital, sugeridas por la recurrida, desmintieron sus alegaciones. Las entrevistadas negaron tener conocimiento de que Vélez hostigara a la recurrida. Igualmente negaron que Vélez las hubiese hostigado. Por el contrario, dijeron que Vélez actuaba de forma respetuosa. Milessa Rivera Cubero negó haber

presenciado el incidente de hostigamiento que la recurrida alegó presenció.

Las diversas razones que dio la recurrida para no presentar prontamente su queja, restaron credibilidad a su versión de los hechos. El temor que expresó para, no informar oportunamente los actos de hostigamiento, no es creíble, debido a que existe basta evidencia de múltiples quejas y reclamos que hizo sin ningún temor. La recurrida incluso se quejó previamente contra el propio Vélez, sin temor alguno. Ante ese escenario resulta obvio concluir que no es creíble que se sintiera obligada a tolerar la alegada conducta de Vélez y a no denunciarla en el momento en que ocurrió. Los mensajes de texto provistos por la propia recurrida evidencian que sus encuentros con Vélez fuera del trabajo eran consentidos y posterior a los alegados actos de hostigamiento. A la misma conclusión llegamos sobre los encuentros que ambos admitieron que ocurrieron en el área de trabajo y durante horas laborables.

Luego de evaluar la prueba de novo, estamos más que convencidos de que no existe controversia de que la recurrida no fue víctima de hostigamiento sexual en el empleo. Por el contrario, la prueba nos convence de que la recurrida incurrió en conducta sexual consentida, con su entonces supervisor, dentro del hospital y durante su horario de trabajo. Igualmente nos convence de que, la recurrida y Vélez, exhibieron la misma conducta fuera del espacio laboral. Nos queda claro que la recurrida violentó reglamentación interna del hospital porque: (1) no notificó prontamente los alegados actos de hostigamiento sexual en el empleo, (2) incurrió en conducta sexual consentida en su lugar de trabajo y en horas laborables, y (3) no informó sobre la relación consentida que tenía con su supervisor.

El peticionario alega en el tercer señalamiento de error, que el TPI debió desestimar sumariamente la totalidad del caso, porque evidenció que el despido de la recurrida fue justificado.

El TPI se negó a desestimar sumariamente la demanda porque existía controversia sobre si la recurrida: (1) fue despedida en represalia por la querella que presentó contra Vélez, (2) usó el Facebook en horas laborales, y (3) usó la computadora del hospital para hacer trabajos universitarios.

Según la prueba, el 17 de julio de 2019, el peticionario recibió una llamada en la que se informó que la recurrida hizo unos comentarios en su red social de Facebook sobre la hija de un paciente de intensivo que era familiar de otra empleada. A la recurrida se le imputó violar las normas de confidencialidad, infringir las disposiciones del Health Insurance Portability and Accountability Act (HIPAA) y afectar la imagen del Hospital Pavía de Arecibo. La publicación hecha por la recurrida fue la siguiente:

Sandra Enid
Tuesday at 9:28pm

Sonia-Barreto fue arrestada en diciembre junto a otras nueve personas por conspirar en un esquema de fraude contra la AAA, la Administración de Desarrollo Laboral y la Cámara de Representantes. Su hermana (Marielis, y la exvicepresidenta de Finanzas de AAA, Ivonne Falcón Nieves; también figuran entre los acusados.

Cumplió solo un año de prisión en EU. Ya está libre...YA TIENE TRABAJO!!!!!!.

Pro-Rehabilitación de los Confinados..... ¿cuán fácil se le hace a un ex confinado "Juan del Pueblo" tener una segunda oportunidad?

GENTE!!!!!!!!! ¿Es en serio? Esto es lo que viene para todos los que nos roban. Se van a sus casas a disfrutar de nuestro dinero.

La prima de esta sin verguenza... la conozco y viene lo más risueña que me. dice: "Hoy la vi, y sí, ya tiene trabajo".

Esta información publicada es totalmente recopilada por la prensa directamente de la sentencia del Tribunal. Y confirmada por la PRIMA de ella quien trabaja conmigo!!!!!! Aquí nadie inventa nada!!!! No traten de tapar lo que es indefendib1e!!!

> **Katisha G**onzalez
> Sandra Enid No es recopilada por la prensa. La recopilaste en tu trabajo. Tu misma lo estas escribiendo. No hay nada que tapar, lo único que si

hay que comentar es que la información que publicas la obtienes en horas laborables y en un hospital. Ley Hipa, etc..
No fue comiendo un helado en Lares.

Katisha Gonzalez
Donde en la sentencia dice que la Sonia tiene trabajo actualmente.

Katisha Gonzalez
Sandra Enid, confirmada por la prima de ella que trabaja contigo en el hospital pavia de Arecibo, dice tu perfil que trabajas ahí. Que mal utilizar tu trabajo y mas en un hospital para publicar. Dios te bendiga.

Sonia Enid

Katisha Gonzalez pruébame que utilizo mi trabajo para protestar!!!!!! Te reto!

Lo lamento mucho joven. Pero mi Facebook no va a ser tu "spot" para defender ni a los que roban ni a los que faciliten que se robe!!!!!! Me mantengo en mi postura! Yo no hablo de más, ni de espalda.

Katisha Gonzalez
Sandra Enid, lo mismo que estas criticando lo estás haciendo con tu trabajo. Según escribes trabajas en el hospital pavia de Arecibo con la prima de Sonia y allí obtienes la información que publicas.
Otro de los delitos del chat. Utilizar información confidencial y privilegiada por el acceso que tienes en tu trabajo, y la publicas para fines personales.

Sandra Enid
Katisha Gonzalez jajjajajaja! Mire joven... el hecho de que una persona comene a viva voz interioridades de su familia... no significa que uno la haya accesado de manera ilegítima. Yo pa chismes no estoy!!!!!!! Si te regodeas frente a mi vanagloriando a una persona porque fue cómplice en el robo de dinero de nuestro país... créeme que YO NO ME VOY A CALLAR!!!!!!!!

Sandra Enid
Desde ayer...dos personas han bombardeado este post que publiqué el martes, en un intento DESESPERADO de que no se riegue que personas que facilitaron el robo a nuestra Isla...ya están por la libre en "menos ná" y con trabajo!!! Con mejores oportunidades que los ex confinados "Juan del Pueblo". Estas personas aseguran que esto es noticia viaja...YO le digo: claro que no!!!" La corrupción en Puerto Rico NO ha parado!!! Y todos estos fraudes que desde hace pocos años hacia acá, han estado saliendo a la luz... hay que recordárselas al pueblo...hasta el 2020!!!!

> La corrupción viene de todos lados. No se olvidan de Anaudy y sus amigos! Ahora también los empleados fantasmas de TRS y para cerrar con broche de oro: Ricky y sus amiguitos!!!
>
> Sandra Enid Yesterday at 1:28 AM
>
> Sonia-Barreto fue arrestada en diciembre junto a otras nueve personas por conspirar en un esquema de fraude contra la AAA, la Administración de Desarrollo Laboral y la Cámara de Representantes. Su hermana (Marielis, y la exvicepresidenta de Finanzas de AAA, Ivonne Falcón Nieves; también figuran entre los acusados.
>
> Cumplió solo un año de prisión en EU. Ya está libre...YA TIENE TRABAJO!!!!!!.
>
> Pro-Rehabilitación de los Confinados..... ¿cuán fácil se le hace a un ex confinado "Juan del Pueblo" tener una segunda oportunidad?
>
> GENTE!!!!!!!! ¿Es en serio? Esto es lo que viene para todos los que nos roban. Se van a sus casas a disfrutar de nuestro dinero.
>
> La prima de esta sin verguenza... la conozco y viene lo más risueña que me. dice: "Hoy la vi, y sí, ya tiene trabajo".
>
>> HC Zelev
>> Y Yo con una maestría no tengo trabajo en lo que estudia por que no tengo palas q prendan la fortaleza hasta q salga esa rata.

Véase, págs. 957-961 del apéndice.

El 22 de junio de 2019, el hospital entrevistó a la recurrida. Fue informada de que la querellante alegó que la Sra. Sonia Barreto visitó a su padre en la unidad de intensivo y que ella hizo unos comentarios en su Facebook sobre la visitante. Además, fue informada que la querellante anunció que también se querellaría contra el hospital por medio de un abogado. La recurrida fue cuestionada sobre el asunto. Textualmente se le preguntó y ella contestó lo siguiente:

> La querellante anunció además que va a presentar una querella contra el Hospital por medio de un abogado. Se nos refirió entonces la situación a Recursos Humanos para la debida investigación. En torno a esta queja es que estamos realizando la presente investigación, de lo que le acabo de mencionar.
>
> 1. **Cuénteme en términos generales que fue lo que pasó y su versión sobre lo que le acabo de mencionar**.

Refiere no tener comunicación con la Sra. Barreto, refiere que la información de la Sra. Barreto es información pública y que se obtiene a través de Google. Refiere que publicó un link de un periódico en el FB. Refiere que en sus comentarios no se menciona al Hospital Pavía, ni en esa ni en ninguna otra publicación de ella.

2. **¿Usted acepta que publicó información relacionada a la Sra. Sonia Barreto en su Facebook?** Acepta que publicó acerca de la sentencia de la Sra. Barreto, refiere no tiene que ver con el hospital.

3. **¿Usted reconoce este documento Anejo 1/su publicación?** Refiere que la parte de arriba el primer párrafo es un Copy Paste de un periódico. Luego desde la expresión que indica que cumplió solo un año, eso lo escribió ella.

4. **¿Este documento es copia exacta de lo que usted publicó el martes 16 de julio de 2019? (ANEJO 1)**. Sí, es lo que escribió. Certifica que es lo que escribió.

5. **¿Este documento es copia exacta de los comentarios que le escribieron otras personas en la publicación sobre Sonia Barreto que usted hizo el martes 16 de julio de 2019? (ANEJO 2)**. Refiere que sí son los comentarios. Refiere que hay otro comentario de otra persona que su foto de perfil era una semilla.

6. **¿Usted conoce a la Sra. Sonia Barreto?** No la conoce. Refiere que sabe de su caso por ser un caso llamativo de corrupción, jamás la ha visto, solo en el periódico.

7. **¿Usted ha visto a la Sra. Sonia Barreto en el Hospital?** No la ha visto y alega que desconocía que tenía un familiar hospitalizado aquí.

8. **¿Quién es la alegada "prima" a la que usted hace referencia en su publicación?** Refiere que no está obligada a confirmar esta información. Refiere que la publicación la hizo a las 9:28 pm. Y es una expresión libre. Se le pregunta si es cierto que obtuvo la información a través de una prima que trabaja en el hospital, según los comentarios de su FB, refiere que ella no tiene que expresar ninguna información que ella publique fuera de horas laborables y además indica tener otro trabajo. Se mantiene de que no tiene que dar esa información y no se responsabilizará de los comentarios de otras personas.

9. **¿Usted obtuvo esa información en horas laborables?** Refiere que no realizó la búsqueda de información en horas laborables. Jamás lo haría.

10. **0 sea que al momento de postear ese comentario en las redes sociales usted conocía que ella era familiar de un paciente del Hospital?**
No sabía que era familiar de ningún paciente. Refiere acaba de enterarse hoy.

**11. ¿Quién tiene acceso a las publicaciones que usted hace en Facebook?**
La publicación [que] realizó de la Sra. Barreto es pública, por lo que cualquiera la puede ver. Hubo tres personas con perfiles que entiende fueron creados ese mismo día.

12. **Se le pregunta si hay otros comentarios que mencionen al Hospital Pávía Arecibo.**
Refiere que no sabe en este momento.

13. **¿Con qué propósito usted hizo esa publicación?** La publicación fue solo como expresión social.

14. **¿Usted reconoce que sus comentarios son despectivos u hostiles hacia la Sra. Sonia Barreto?** No.

15. **¿Quién es la Sra. Katisha González?** Desconoce, entiende es un perfil falso.

16. **¿Usted reconoce que la Sra Katisha González le hizo imputaciones de aprovechar su trabajo y horas laborables para obtener información sobre visitantes y después divulgarlo en su Facebook? (Anejo 2).** Refiere que no realiza publicaciones en horas laborables y que si ella (Katisha) o cualquiera tiene evidencias que las presente. No conoce a Katisha, refiere que es un FB falso, ya que es un FB acabado de hacer.

17. **Usted reconoce que la Sra. Katisha González le hizo imputaciones a usted de aprovechar su trabajo para violar la Ley HIPAA?** Refiere que en sus comentarios no refiere nada que tenga que ver con el paciente o familiar de algún paciente.

18. **¿Usted notificó a algún supervisor o personal de Recursos Humanos que le estaban haciendo imputaciones de violación de la Ley HIPAA que vinculaban al Hospital?**
Refiere que no lo refirió a ningún supervisor, ya que no lo entendió necesario.

19. **¿Usted reconoce que era su deber comunicar las imputaciones que le realizaron mencionando el hospital?** No, porque no es ella quien mencionó el hospital. Indica que radiquen la querella a ver si hay algo.

20. **¿Usted se identifica en su Facebook como empleada del Hospital Pavía Arecibo?** Afirma que en la biografía aparece identificada como que trabaja en el Hospital Pavía.

21. **¿Usted accede a su red social de Facebook en horas laborables?** Refiere no acceder el FB en horas laborables.

22. **¿Usted hace publicaciones en su red social de Facebook en horas laborables?** Refiere que no, que ella tiene programado un blog que aun ella durmiendo salen en horarios programados por ella.

23. **¿Usted entiende que es correcto y apropiado publicar esas comunicaciones sobre visitantes de pacientes del Hospital?** No contestará eso.

24. **¿Usted reconoce haber recibido el Manual de! Empleado(a) del Hospital?** Si, lo reconoce haber recibido el mismo.

25. **¿Usted reconoce que es conducta prohibida el acceder a Facebook o a cualquier red social para propósitos no relacionadas con sus funciones de trabajo, que puede dar base a acciones disciplinarias?** Sí.

26. **¿Usted reconoce que es conducta prohibida el utilizar el equipo y red de Internet para propósitos personales durante horas laborables, la cual puede dar base a acciones disciplinarias?** Refiere que sí, que conoce las normas del hospital.

27. **¿Hay alguna evidencia para apoyar su versión de lo que sucedió?**

28. **¿Ha hablado con alguien sobre el incidente?** Refiere que no ha dialogado con nadie ya que no lo encontró necesario.

**29. Usted sabe si alguna otra persona reportó o se quejó de esta conducta.** Refiere que hubo tres personas en FB que han estado realizando comentarios.

**30. Hay algo más que usted quiera compartir con nosotros que usted entiende que debe ser importante.** Refiere que no firmará ningún documento por lo que prefiere contestarlo por escrito mañana, ya que se tiene que ir debido a que tiene un compromiso y no iba a esperar.

Véase, págs. 953-956 del apéndice. (Énfasis en el original).

El hospital entrevistó a Iris S. Rivera Chez, la otra empleada a quien la querellante identificó como prima de Sonia Barreto. La entrevistada dijo que: (1) desconocer de la situación, (2) conoce a Barreto porque es su prima lejana y que habla con ella casualmente, (3) el padre de Barreto está hospitalizado en intensivo, pero no lo ha visto en el hospital, (4) la recurrida le preguntó si Barreto está trabajando y le contestó que sí, pero fue lo único que le dijo, (5) desconoce sobre la publicación de Facebook, (6) la recurrida sabe que el padre de Barreto está hospitalizado, pero entiende que no la ha visto porque viene en horarios que no coinciden, (7) la recurrida le

preguntó si Barreto era su prima y si trabajaba en el hospital, porque escuchó a su mamá preguntarle si la había visto, (8) Sonia Barreto dialogó con ella y le dijo que se sentía incomoda y que no conocía a la recurrida. Finalmente comentó que la situación le sorprendió y que se siente incómoda porque trabaja con la recurrida y ella sabe que Barreto es su prima. Véase, pág. 963 del apéndice.

Según consta en la minuta del 23 de julio de 2019, el peticionario reunió a la recurrida para informarle que la investigación había concluido y que la decisión era prescindir de sus servicios conforme al procedimiento disciplinario. No obstante, de la minuta surge que la recurrida interrumpió el proceso, tomó la carta y abandonó la reunión, a pesar de que se le pidió que no lo hiciera. Véase, pág. 1504 del apéndice. La recurrida recibió la carta de despido en igual fecha. Véase, pág. 1505 del apéndice.

El 23 de julio de 2019, la recurrida negó por escrito todas las alegaciones de la querella y argumentó que se estaba violentando su derecho a expresarse. Véase, págs. 167-169 del apéndice.

La existencia de justa causa para el despido de la recurrida es un hecho incontrovertido. El Manual del Empleado define la justa causa para el despido como aquella razón que no está motivada por consideraciones legalmente prohibidas y que no es producto del mero capricho. La definición incluye las razones que afectan el buen y normal funcionamiento del hospital, incluyendo el incurrir en un patrón de conducta impropia o desordenada y quejas de pacientes visitantes o compañeros. Además de la violación reiterada de estas reglas o de cualquier reglamento establecido del hospital. La lista de razones para la justa causa no es taxativa. El historial del empleado puede considerarse para determinar la severidad de las ofensas, remedio o penalidad. Véase, págs. 105-106 del apéndice.

Aunque el hospital reconoce que no tiene inherencia sobre el tiempo y la vida privada de sus empleados, entiende que toda

información plasmada en las redes sociales puede tener un efecto adverso sobre la imagen y bienestar del hospital y sus pacientes. Por esa razón, en el Manual de Empleados se prohíbe la publicación de fotos de pacientes e imágenes de clientes. Los empleados, además, están obligados a cumplir con la legislación aplicable de privacidad y confidencialidad sobre la salud de los pacientes y a respetar los derechos de terceras personas. Véase, pág. 21 del Manual, pág. 721 del apéndice. Igualmente están obligados a cumplir con una cláusula de confidencialidad. La recurrida firmó la cláusula de confidencialidad el 11 de febrero de 2014. Véase, pág. 777 del apéndice. El Manual define la confidencialidad como el compromiso que debe realizar su destinatario de guardar para sí, con recelo, cierta información con la que contará y tendrá acceso, a través de su participación en alguna actividad o trabajo en la institución. Véase, pág. 83 del Manual, pág. 752 del apéndice. No se tolerará divulgar u ofrecer información confidencial relacionada con la institución, pacientes, visitantes o empleados. Véase, pág. 86 del Manual, pág. 754 del apéndice.

Las expresiones que hizo la recurrida en su red social laceran la imagen del peticionario, porque se identificó como asistente administrativa del Hospital Pavía Arecibo e hizo comentarios despectivos sobre una visitante, dio información confidencial de un paciente de intensivo y se refirió a una compañera de trabajo, como la persona que le dio esa información. La recurrida obtuvo información en su lugar de trabajo y en horario laboral por voz de un familiar del paciente que también trabaja en el hospital. La señora Rosa violentó el principio de confidencialidad porque usó esa información para publicarla en su red social. A eso, se añade que dio información falsa durante el proceso de la investigación, porque negó hechos que eran de su conocimiento.

La publicación en la red social Facebook que hizo la recurrida es razón suficiente para su despido. El hospital no actuó motivado por

consideraciones legalmente prohibidas, ni por mero capricho. El acto cometido afectó el buen y normal funcionamiento del hospital, porque la recurrida utilizó su tiempo de trabajo para obtener información que luego publicó en su red social. Además, afectó el prestigio y la reputación del hospital, porque hizo pública información confidencial e implicó a otra compañera de trabajo.

Por razones obvias, es un hecho probado que la recurrida no fue despedida en represalia por la querella que presentó contra Vélez. Su despido obedece a la publicación que hizo en la red social de Facebook. No obstante, a diferencia de lo que alega, la voluminosa evidencia documental que obra en este expediente, nos convence de que el patrono le concedió múltiples oportunidades antes de llegar al despido. Su historial laboral demuestra que fue objeto de un sinnúmero de amonestaciones, debido a su continuo patrón de desafío al cumplimiento del Manual del Empleado. A continuación, algunas de las violaciones al Manual del Empleado que cometió:

(1) El 11 de septiembre de 2014 fue amonestada verbalmente por conducta no apropiada al dirigirse a un supervisor inmediato. Véase, pág. 782 del apéndice.

(2) El 24 de octubre de 2014 amonestada porque no llevó un expediente de readmisión que debió llevar a sala de operaciones. Véase, pág. 785 del apéndice.

(3) El 9 de noviembre de 2014 un empleado presentó una queja en su contra por la forma en que lo trató. Véase, pág. 786 del apéndice.

(4) El 18 de noviembre de 2014 recibió una amonestación escrita por dejar de hacer sus tareas diarias, dejadez causando atrasos y por comportarse de forma irrespetuosa, o descortés. Véase, pág. 789 del apéndice.

(5) El 19 de noviembre de 2014 presentó un referido por represalias contra la señora Padilla. El 2 de diciembre 2014 comunicó a la recurrida que no se pudo concluir que Padilla cometió represalias en su contra. Véase, pág. 793 del apéndice.

(6) El 16 de septiembre de 2015 fue amonestada por un incidente con su supervisor Ángelo Quiles y por uso del celular en horas laborables. Fue advertida de que tenía que mejorar su cumplimiento con las normas

de la institución, porque de lo contrario se tomarían acciones disciplinarias más severas según el Manual del Empleado. Véase, págs. 801-802 del apéndice.

(7) El 6 de junio de 2018 fue suspendida 5 días porque se comportó de forma desatenta, irrespetuosa o descortés hacia sus compañeros o supervisores.

(8) El 31 de octubre de 2018 fue amonestada por incurrir en conducta sexual consentida en el área de trabajo y por no reportar inmediatamente un acto de hostigamiento sexual y traslada al área de vacunación.

(9) El 2 de noviembre de 2018 fue apercibida de que no podía usar el equipo del hospital, ni el tiempo laborar para asuntos personales, debido a que se encontraron trabajos de la universidad a la que asistía en la computadora y en la fotocopiadora del Hospital de Arecibo. Véase, pág. 272 del apéndice.

(10) Utilizó el Facebook en horas laborables. Véase, pag. 1202 del apéndice.

Las alegaciones de represalia de la recurrida son totalmente inverosímiles, porque muchas de las faltas que cometió conllevan el despido como primera sanción. Véase, infracciones 37, 49, 61, 62, 84, 90, 101, 102 y 105 del Manual del Empleado. Sin embargo, el recurrido le permitió continuar en el empleo, pero su reiterado incumplimiento con las normas del hospital ocasionó finalmente su despido.

Nuestro juicio de novo sobre la totalidad de la prueba, nos convence de que procede la desestimación de la totalidad de la demanda, porque no existe controversia de hechos de que: (1) la recurrida no fue objeto de represalias y (6) el despido fue justificado. Nos queda claro que: (1) las reglas establecidas por el hospital para su funcionamiento son razonables, (2) que el hospital le entregó copia de esas normas a la recurrida y que la señora Rosa las violentó reiteradamente.

**IV**

Por lo antes expuesto, se expide el recurso, se revoca la resolución recurrida y se desestima la totalidad de la demanda porque no existe controversia de hechos esenciales.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones